Good morning, Your Honors. Mark Adams. I represent Douglas McClain. Mr. McClain did not get a fair trial in this case. A co-defendant, Spanier, steadfastly maintained that he was not guilty because Mr. McClain was guilty. He was not guilty because Mr. McClain lied to him, Mr. McClain lied to the borrowers, and that never changed from the opening statement to the cross-examination of all of the government's witnesses to the presentation of Mr. Spanier's defense witnesses and during his closing argument. For Mr. Spanier to prevail, Mr. McClain had to be convicted, and that is exactly what happened in this case. The only way that Mr. Spanier walked away from that first trial with not guilty verdicts on six of the counts and not a single conviction. Well, that's not quite right, is it, Mr. Adams? Is there a possibility that Spanier could be believed that he didn't know anything about the scheme and McClain could be believed that he didn't know anything about the scheme? It was all Maselli's problem. Maselli, of course, had suicided. That was a possibility. A very remote possibility, but I don't think it rings at all true under the facts of this case, Judge Bay. In this case and where we were here, there were really no common defense themes or common defense elements. Mr. Spanier steadfastly maintained that McClain was guilty and he was not guilty, and that's what happened. Let me follow up on Judge Bay's question. McClain took the position that what he did was not a crime. Isn't that right? He did. Okay. Well, if what McClain did was not a crime, then Spanier, whatever Spanier did, wouldn't have been a crime either. Wouldn't that be true? Well, not necessarily. It's conceivable that he could have known that the stock was to be sold or that there was some other. Okay. But McClain's position is he had the right to sell the stock. Yes. Okay. If McClain is right that he had the right to sell the stock, then Spanier couldn't have been guilty either. Well, those were not the only allegations in the indictment of fraud. There were other allegations about back-end fees and incentive fees and so on that were alleged in the indictment that could have been a pathway for conviction of Spanier, I suppose. Yes. Said another way, if the jury believed Spanier's defense, did it necessarily have to convict McClain? I believe it did, yes, because his defense was McClain lied, McClain's guilty, and the only way that I'm found not guilty is if McClain's guilty. He's saying McClain lied by telling me that he had the power to sell the stock, and that's what McClain said because he argued that under Section 17A of the Securities Act, an offer or sale included the pledge of the stock. That's why he tended to Rubin instruction. And so he said, look, these people knew perfectly well when they gave me their stock to borrow against because they couldn't sell it without telling the SEC, and that would be a violation because they were selling it within a period of time when insider knowledge was violative of the law. So what I did, says McClain, was perfectly legal. I sold the stock because everybody knew I could sell the stock. That's what I told Spanier. Spanier got it all wrong. It wasn't a lie. It was the truth. Well, that was our defense, but that's not what the borrowers testified to when they came to court. What they said was facts are sometimes inconvenient. Yes, sir. Right. They came to court, though, and said we were promised that the stock would never be sold. Well, that's not what McClain said. McClain said I was perfectly within my rights in selling it. It's a conflict in the testimony, but there is a way, and there was a way, for both McClain and Spanier to walk. Well, I disagree with that. I'm convinced, and that's part of the antagonism in presenting these conflicting defenses, and I think they are mutually exclusive in that Spanier walked away because McClain got convicted, and the jury accepted Spanier's defense. They actually acquitted him on six counts, and they were unable to resolve the remaining 22, but the proof is also in the pudding, and that is that a second trial where Spanier's tried alone, he was swiftly convicted of all of the counts with which he was charged. As to the jury instruction issue, we were promised that instruction by the district court. It was inadvertently left out of the district court's pre-instruction. Mr. McClain gave his closing argument, or I gave the closing argument on his behalf, and it was founded on the legal instruction that Mr. McClain was within his rights to sell the stock and that the pledge of the stock as a collateral was a sale or offer, but it was a sale essentially within the meaning of the securities laws, as you point out, Judge Bay, and the reason, of course, for that is so that the policy considerations being that when an insider is transacting stock, we want that to be a transparent transaction. Section 17 is for the purpose of protecting an investor so that he doesn't be the victim of a fraudulent misrepresentation when he pledges his stock, when he enters into the pledge of the stock. They say that transaction, pledging the stock, can be just as deleterious to an investor as a sale of the stock, so we want to protect that person. That doesn't mean that a pledge of the stock is a sale. No, exactly right. But what it does is it signals that there should be some transparency with respect to an insider moving stock, either pledging it as security for a loan or actually selling it. There should be some publicly known report. Well, there should be no misrepresentation. Right. Or material omission. Exactly right, so that investors know exactly what insiders are doing, and then if there are losses that apparently presumably tax consequences would flow also from those transactions. And so the district court changed his position after our closing argument, pulling the rug out from under our theory of the defense. That's what I wanted to follow. Go ahead. After it was discovered that the instruction that he said he was going to give wasn't given, what happened then? The district court agreed to give the instruction, and then we gave our closing arguments. Right. After the closing arguments, the district court reversed course and declined to give the instruction. Now, was there a motion for mistrial at that point? There was. I don't know if I moved for mistrial, but I know I objected. Well, okay, but that's a pretty important point to me, because at this point you've made your closing argument and you're sort of gambling on how the jury is going to come back. And, you know, it seems to me if you thought you couldn't get a fair trial, the time to make a motion for mistrial was then. You can't wait and see how the jury comes back, and then you don't come back with it. Good point, Judge Silverman. And I know that I did object strenuously that the court had not given our instruction. Whether or not I used the words mistrial, I just honestly don't recall. They're not just words. I mean, it has significance in that you start all over again. Certainly. Certainly. Whether or not I made that motion, I just don't recall as I stand here. I can provide the court with that. My note is that there was no mistrial motion made. I tried to find it. I couldn't find one made. So it looks like what happened is the scenario that you just described, but then you kind of kept your fingers crossed and hoped they'd acquit them. And when they didn't, they didn't, you know. Well, we were pretty upset that the court had reversed course and declined to give that instruction because it really was the legal foundation for a good part of our arguments. Okay. Your Honors, with respect to the sentencing issue, we believe that the court just simply did not make the factual findings that were required and did not address our objections that the sale of the stock caused these borrowers losses or other objections with respect to the fact that many of the so-called victims actually profited from the stock loan transaction. In fact, one of them took away about $7-plus million on stock that was worth some $600,000 or so at the time of the sentencing. Many of these contracts were entered into in 2010, 2011, and were three-year contracts with 12- and 18-month lockout periods where they couldn't repay their loan, no early repayment. But those three-year contracts had not even become ripe at the time of the trial or even some at the time of sentencing. And so it was impossible to know exactly what the losses would be. But in one case, Mr. Yao took $7-plus million on stock that was worth just about $600,000, $700,000 at the time of sentencing, and yet the government was asking for $3.7 million in restitution for him. And that's true of a number of others that we set forth in the briefing and I think most concisely in the reply brief. There's a section there that sets forth the number of different victims who actually profited handsomely from the stock loan transactions because their stock lost value in the ensuing months from the time they made the loan and took the loan proceeds. I would like to reserve my remaining time for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Counsel. My name is Faith Devine. I represent the United States in this case, and seated with me at counsel table is Michael Wheat, who is my co-counsel on the trial in this case. Thank you. Your Honors, as you know, there are three issues in this case, the severance issue, the jury instruction issue, and the sentencing issue. None of these issues present or warrant reversing the convictions or remanding the sentence in this case. First of all, as to the severance issue, when you look at the record as a whole, you can see that there were a number of common defense themes between Mr. Spanier and Mr. McClain, and the jury was not left with a one or the other situation here where if you believed Spanier, you had to acquit Mr. McClain. This case, as Judge Benitez had said when he ruled on the severance motion, is a case in which multiple scenarios could have happened. The jury could have concluded that there was no crime here. That was the defense of both Mr. Spanier and Mr. McClain. The idea was they wanted the jury to believe this was just a business dispute over the contract, so it could have resulted in an acquittal for both defendants. It could have resulted in convictions for both defendants if the jury didn't believe either Mr. Spanier or Mr. McClain. And as the case law shows, it's very rare circumstances that warrant a severance. How could McClain have been acquitted and Spanier convicted? Under what scenario would that have happened? Because the jury could have believed, as Mr. Spanier said, that they believed that the contract language allowed them to sell the stock. No. Okay. So how would Spanier have been found guilty? I guess maybe I misspoke. My question is, under what scenario could McClain have been acquitted and Spanier convicted? Spanier could have been convicted if, in the case of he had told the borrowers that the stock would not be sold, if he knew that they could sell the stock or they were selling the stock, the jury might have been able to conclude that he was lying to them and Mr. McClain wasn't lying. Does that make sense? I'll have to chew on that one a minute. If Mr. McClain had said he had every right to sell the stock, but then Mr. Spanier was lying to the borrowers, then you could have had an acquittal and a conviction. So there was multiple scenarios here. And I think what's telling is, is that the jury could have been able to conclude that the stock would not be sold, but the stock could be sold under McClain's theory. Then what Spanier was telling the investors was not a material representation. Well, it is, because what he was telling them is that the stock would not be sold and that the Argyle, the company Argyle would comply with all the securities laws because what was of concern to the borrowers was that they did not want that stock sold because they weren't allowed. They would have to report that to the SEC. The reporting public, it was an insider transaction. And they would have to recognize tax consequences. Exactly. Okay. Exactly. So that's why this case has the multiple scenarios. It's not similar to the Tutick or the Mayfield cases where one, the argument of one defendant would require the acquittal of the co-defendant. And that's what the district court saw as he went through this trial. And as he went through the trial, there was no prejudicial evidence that was introduced, that was objected to. All of the evidence in this case would have been presented in a separate trial. And so here, Mr. McClain never showed any prejudice. Let me ask you, excuse me, did you want to finish your sentence? No, you're on. Okay. Let me ask you about the jury instruction. Apparently Judge Bonita said he was going to give an instruction. Counsel says the closing argument he had planned was built around this instruction. And then the instruction is not given. And the judge says, I've changed my mind. I'm not going to give it. What do you make of that? Well, I do take issue with the word promise, because I don't think that Judge Bonita's promised the instruction. There was a jury instruction. What word should I say? He indicated he would give the instruction? Indicated, yeah. Okay. So he indicated. What happened was, if you read the record, that we had the jury instruction conference, and then the closing arguments were delivered, and then there was an overnight. And I believe that during the closing arguments, Judge Bonita's had the opportunity to look at the Rubin case much more thoroughly. And that's when he discovered that the proposed instruction was not only incorrect on the law, but also was very misleading. It was designed to influence the jury to make a decision on the factual dispute in this case, which was that the borrowers didn't intend to sell their stock. So I think what Bonita's did was he corrected the record, because he could see that there was going to be prejudice and that the jury was going to be misled. And that's why he changed his decision. And if you look at the record, he says that. And he said, Mr. Adams, I've had the opportunity to look at this Rubin case more thoroughly. And that's, I think, at that point is when he said that he wasn't going to give the instruction. Now, even if you think he should have given the instruction, I think here it's clearly the instruction was not a correct statement of the law. No, my question is not. I take your point that the instruction should not have been given. Correct. My concern is the judge said he's going to give it. Counsel builds his argument around the assumption that it's going to be given, and then it's not given. I don't fault the judge for not giving a wrong instruction. I fault, you know, I'm concerned about what happens when you plan a strategy and then, in his words, the rug's pulled out from under you. I understand that. And first of all, he did argue his theory to the jury that the sale of the stock was not a crime. The judge did give an instruction that where he said that the theory of the defense is, is that Mr. McClain claims that he did not commit a crime, that the sale of the stock in and of itself was not a crime. So the judge did give one instruction that articulated that theory. Here, what happened was not prejudicial. And I think that Mr. Adams pointed that out in his reply brief, that even if the district court informed him before the closing argument, it's not reversible unless there is prejudice. And how could he have been prejudiced if that instruction was not correct on the law and was designed to mislead the jury? Well, he was prejudiced because he built his argument around an instruction that he thought it was going to be given. Well, I don't believe that if you read his argument, it's not built around that one instruction. Judge Benitez gave the instruction that his theory of defense was that Mr. McClain believed that it was not a crime, that the sale of the stock in this case was not a crime. And that is the same. Well, that goes to the subjective element of intent. But it doesn't go to the objective element of whether it was or not a crime. And that was what Mr. Adams was waiting to argue on and did argue on. Well, and then at that point, what objection is made after the fact? Well, he did make a motion for mistrial. He did make a motion to reopen his closing argument and correct any error that he might have made and emphasize other points. Those two things are omissions. Correct. And finally, as to the sentencing issue, I just have one point to make, is that the loss in this case is based upon the sale of the stock at the time it was pledged as collateral for the loan. And that's when the fraud occurred. And the consensus theory, which is what the jury accepted, was that these contracts were just a facade and part of ñ created this air of legitimacy. And, in fact, the fraud was when they obtained the stock. So when they obtained the stock, they sold the stock. That stock belonged to the borrowers. They gave the borrowers their loan, and then they took the rest and split it amongst themselves. But was that really a loss to the shareholder? Because if the amount of money that the improper sale fetched was not available to the investor because he couldn't sell the stock anyway, isn't it ñ how can you say that that's the value of the stock to that investor at the time of the sale? It is because they were not prohibited from selling their stock. Their choice was, and you'll see that in the testimony, was that they did not want to sell their stock. They wanted to get a loan against the stock because they thought it would be worth more money at a future date. Oh, I thought they were able to sell their stock because being insiders, they had to wait a certain amount of time after the event which had caused the stock to rise so that they wouldn't be accused by the SEC of using insider knowledge. No, that was not the testimony. The borrowers actually ñ many of the borrowers had the right to sell it, but the testimony was that they would have to fill out a Form 4, notifying the public and the shareholders in the company that they were selling their stock. They didn't want to do that because they felt that that would hurt the company and they wanted to keep their stock, but they weren't prohibited from doing so. They had the choice whether they wanted to borrow against their stock or sell it at the time. And what they didn't know is that this lender that they went to was actually selling it, so they could have just sold the stock themselves. And the argument that the appellant is making is that somehow he should benefit from the fact that some of the borrower's stock went down in value at a later date, and that's not the correct way of calculating the losses here. And I think Judge Benitez was correct when he determined that the loss calculation that the government had submitted was correct, and that was the losses that were proven at trial. And it already took into account the borrower's funds, or the money that the borrowers got on their loans. So we've already taken into account the money that was returned to each one of the victims, and that's already been accounted for. So the actual losses that were presented were actually a very conservative loss figure because it had already taken into account the money that the borrowers had received when they got their loan after the stock had been sold. The other thing is, is that Mr. McClain, he actually submitted his own chart, his own calculation, which is in the record. And if you add up all the gains, even under his theory, the losses were $12 million. And so there really isn't a very large, drastic discrepancy here in the loss calculations and what the sentence would be, because Judge Benitez actually varied significantly. The sentence started out as a life sentence and ended up with 15 years. With that, unless the Court has any other questions, I would submit. Well, they're just, his calculation was a $12 million loss, did you say? Correct. And the guideline that Judge Benitez applied was an over $50 million loss, is that right? Correct. So what would the difference be? It's a four-level difference in the enhancement. The Judge Benitez applied a 24-level enhancement, and if you calculate the gains or the losses to the investors on Mr. McClain's chart, it would have been a 20-level enhancement. So the difference is four levels. Which, what does that come out to in the sentencing range? Do you recall off the top of your head? It would be, well, we started out at 44, so it would be 40. If I can have a moment. Forty, 292 to 365 months would be the sentencing range. At level 20 or at level 24? It would be a level 40, offense level 40, 292 to 365. At level? Forty. Forty. And at level 44, it was what? A life sentence. It was beyond the chart, beyond the table. Gotcha. Thank you very much. Thank you. Okay, Mr. Adams, you've got about four minutes and change left. Thank you, Judge Sobeland. Counsel suggests that there were common defense themes. Mr. Spanier never took the position that there was no crime committed. He always took the position from the very first words out of his mouth in opening statement all the way through to the closing argument that there was a crime committed and that McClain was the criminal actor. And he very forcefully presented that position throughout. In fact, he stood up in closing argument, and I think one of the first things out of his mouth was that, yes, the government has proven a crime. I agree with him 100 percent, but it was Douglas McClain that committed the crime. I was on the other side of the Argyle Curtain, if you will. I was not in the know. I was kept in the dark. And I think Judge Bay had it just right when he suggested that there's really, if it wasn't a lie, if he could sell the stock, then Spanier's representations that the stock would not be sold wouldn't matter. And so our view is that there's really no conceivable scenario where Mr. McClain could have been acquitted at this trial and Mr. Spanier convicted as to prejudice in his closing argument. If Spanier said to the investors, your stock can be sold but won't be sold, when he knew that it would be sold, that would be a material misrepresentation. I suppose it would under those circumstances, right, and that hypothetical. But as to prejudice, one of the things that happened in his closing argument was that counsel for Mr. Spanier commented that his client had dropped his suit of armor, if you will, and his protections under the Fifth Amendment, and took the witness stand and testified on his behalf, implicating, and by inference, of course, implicating Mr. McClain's right to remain silent. Had the government commented in such a way, that would have been Griffith error in our view and Griffin error in our view. Next, as to the instructions, whether Judge Benitez promised or indicated under Rule 30, we're entitled to have a settled set of instructions so that we can meaningfully build our arguments around those instructions. And our view is that the instruction we asked for was a clear and accurate statement of a law directly from a Supreme Court authority. The pledge of stock as collateral for a loan is a sale of the stock within the meaning of the securities laws. And I reread Rubin again last night, and it just couldn't be any more crystal clear. And stock is not like, and I think government counsel suggested that they would have just taken this stock and gone into a back room somewhere and set it on a shelf. It's not like that, of course. We all know that stock in publicly traded companies is a dynamic asset. It's a dynamic piece of collateral, and hedging strategies have to be employed. The loan documents themselves, which we pointed out with each of the witnesses, allowed for the company, the Argyle Company, to hold all or a portion of that collateral, which suggests that they could sell some part of it. Some of the contracts suggested they could hold the collateral as cash. All of the contracts talked about that they could use the stock in some hedging environment. It makes no sense to shift the risk of loss entirely to the lender and then tie the lender's hands in a way that the lender couldn't do anything to hedge against that downside risk and not enjoy any of the upside benefit should the stock increase. You don't argue now, as you did at the trial, that he had the right to sell the stock, do you? On appeal? No, not on appeal, no. That's water under the bridge. Yes, water under the bridge. Thank you, guys. Been there, done that. Okay. Thank you very much. Thank you very much, Mr. Adams. Mr. Vine, thank you. The case is value to submit, and we'll stand and recess for the morning.
judges: Bell, Silverman, Bea